433 F.2d 212
 MIDDLEWEST MOTOR FREIGHT BUREAU et al., Appellees,
v.
UNITED STATES of America, Appellant.
MIDDLEWEST MOTOR FREIGHT BUREAU et al., Appellees,
v.
NATIONAL SMALL SHIPMENTS TRAFFIC CONFERENCE, INC., et al., Appellants.
 No. 19863.
 No. 19870.
 United States Court of Appeals, Eighth Circuit.
 October 6, 1970.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Donald L. Horowitz, Atty., Dept. of Justice, Washington, D. C., for appellant the United States; William D. Ruckelshaus, Asst. Atty. Gen., and Alan S. Rosenthal and Norman G. Knopf, Washington, D. C., on the briefs.
 Arthur A. Arsham, New York City, for appellants, The National Small Shipments Traffic Conference, Inc., and others; John J. C. Martin, New York City, and Richard A. Bowman, Minneapolis, Minn., on the briefs.
 Harold C. Evarts, Minneapolis, Minn., for appellees, Middlewest Motor Freight Bureau, and others; George D. Michalson, Kansas City, Mo., and Roland Rice, Washington, D. C., on the briefs.
 Before VOGEL, Senior Circuit Judge, and GIBSON and BRIGHT, Circuit Judges.
 GIBSON, Circuit Judge.
 
 
 1
 This is a consolidated appeal by the United States in its capacity as a shipper (No. 19,863) and by other intervening shippers (No. 19870) (hereinafter collectively referred to as shippers) from the judgment of a Three-Judge District Court in the District of Minnesota denying them restitution for excessive rates charged by appellees Middlewest Motor Freight Bureau and its operative interstate trucking carriers (hereinafter collectively referred to as carriers).
 
 
 2
 Initially the carriers sued under 28 U.S.C. § 2325 and other applicable statutes to enjoin the Interstate Commerce Commission's order canceling their then existing rates. This action called for the convening of a Three-Judge District Court. After obtaining a temporary restraining order from the district judge, the carriers were denied an interlocutory injunction against the ICC order and later requested and secured dismissal of their injunction request on the ground of mootness. In the meantime, the shippers had intervened in the action and had filed counterclaims for alleged excessive freight rates charged during the period of September 13 to 29, 1965, when, but for the intervention of the temporary restraining order, the ICC's order canceling the rates would have been in effect. According to the brief of the National Small Shipments Traffic Conference, Inc., et al., the rate increases were estimated to amount to a minimum of $70,000 per day, making the cost to the public and the concerned shippers for the period involved at least $1,190,000. The shippers contend this amount should be restored to them or to the various shippers who were forced to pay the increased rates by reason of the court's restraint of the ICC order. The carriers contend they are entitled to the rates collected for reasons hereafter discussed.
 
 
 3
 An understanding of the facts of this controversy requires a brief explication of the regulatory scheme established by Congress by which rates of carriers of goods shipped in interstate commerce are determined. According to the provisions of the Interstate Commerce Act, 49 U.S. C. § 316 et seq., carriers are required to establish "just and reasonable rates" to be charged to shippers of goods. These rates are established by the carriers' filing with the Interstate Commerce Commission tariffs (schedules) of the rates, fares, and charges to be applied by the carriers. The tariffs must be published as required by Commission regulations. The carriers may charge to shippers only the rates specified in the published tariffs. The tariffs, as filed and published by the carriers, are effective, unless the Interstate Commerce Commission finds in an administrative proceeding that they are not shown to be just and reasonable or that they are otherwise violative of the Act; but the Commission itself does not determine rates. If, after the various administrative procedures are followed, the Commission issues a final order rejecting a carrier's tariff, there are three options open to the carrier to determine its operating rates: (1) it may revert to the immediately prior published tariff; (2) it may file a new tariff with the Commission, with higher or lower rates, and thus begin the administrative process anew; or (3) it may seek judicial review of the Commission's order. In conjunction with this last option, an interlocutory or permanent injunction may be sought staying the Commission's order, in which case a three-judge district court must be convened under 28 U.S.C. § 2325.
 
 
 4
 Because the initiative for determining effective rates rests with the carriers and not with the Interstate Commerce Commission, and because the various administrative and judicial proceedings required to reach a final determination of the lawfulness of the carriers' rates are exceedingly complex, it often happens that in the interim between the filing of a tariff and the final disposition of that tariff, the carriers charge rates which are higher than ones to which they are entitled. In such a situation, the question arises of what remedies, if any are available to shippers who have paid the higher rates. In this case we consider aspects of that pragmatic question.
 
 I. STATEMENT OF THE CASE
 
 5
 The carriers filed tariffs with the Interstate Commerce Commission containing increased rates and charges on less than truckload (LTL) shipments and any quantity shipments in middlewest and central territories which were to take effect July 1, 1963.[1] Upon the filing of a complaint by the shippers, the Commission suspended the new tariffs and ordered an investigation. Then on September 7, 1963, the suspension order was vacated by the ICC and the increased rates were permitted to take effect, but the investigation and hearing on the lawfulness of the tariffs was continued. The Commission issued its final report and order on February 24, 1965, finding that "the proposed increases are not shown to be just and reasonable," and ordering the tariffs canceled. The basis underlying the Commission's report and order was that the carriers had not met their burden of proof under 49 U.S.C. § 316 (g) justifying the increase in rates. LTL Class Rates & Minimum Charges between Midwest and Central Territories, 325 I.C.C. 106 (1965).
 
 
 6
 The effective date of the original order was April 14, 1965, but the carriers obtained several postponements of the order until an ultimate compliance date of September 13, 1965, was set. Throughout this period, the carriers had ample time to publish new tariffs with a statutory 30-day notice requirement, but failed to do so. On August 30, 1965, the ICC denied any further postponement of the compliance date. At this point, the carriers had the option of complying with the order or seeking judicial review. They chose review.
 
 
 7
 On September 9, 1965, the carriers filed suit against the Government and the Commission to enjoin enforcement of the order, which was to take effect September 13. The district judge pursuant to 28 U.S.C. § 2284(3) issued a temporary restraining order and required the carriers to post a bond in the amount of $200,000 (later increased to $300,000) for the payment of damages in case the order was wrongfully restrained.
 
 
 8
 The private shippers who had participated in the Commission proceedings sought and were allowed to intervene as parties defendant to oppose the injunction against the ICC order, and were also allowed to file counterclaims against the carriers for damages arising out of the operation of the temporary restraining order on the ICC's order of cancellation of the rates under review. The basis of the counterclaims was that the shippers were compelled to pay higher rates during the period of the temporary restraining order than they would have if the cancellation order had gone into effect. Later the Government was allowed to intervene in its capacity as a shipper and filed a similar counterclaim.
 
 
 9
 On September 24, 1965, the Three-Judge Court was convened to hear the carriers' motion for an interlocutory injunction against the ICC order. The motion was denied, but the temporary restraining order was continued in effect until September 29, 1965, to permit the drawing up of findings and a final order. On September 29, the Three-Judge Court issued its findings of fact and conclusions of law denying the interlocutory injunction and dissolving the temporary restraining order. The decision rested primarily on three grounds: (1) the carriers failed to demonstrate a reasonable probability that the Commission's order would be overturned; (2) the carriers had administrative remedies which would enable them to obtain increased rates; and (3) the magnitude of the loss to the public, combined with the "remote possibility" of the carriers' success, justified denial of the interlocutory injunction.
 
 
 10
 At this point in the litigation, the carriers found themselves in an uncomfortable legal situation. They were required by statute to charge only published tariffs, and they had published none other than those now effectively ordered canceled by the ICC. If they charged these tariffs, they faced the possibility of criminal sanctions under 49 U.S.C. § 322. If they charged new unpublished tariffs, even lower ones, they also incurred the possibility of criminal sanctions under that section. Whether or not this assessment of their legal position is in fact accurate is not material to this decision, but it nevertheless was a motivating factor in the further proceedings which ensued.
 
 
 11
 The carriers immediately made an ex parte application to the Commission seeking another postponement of the cancellation order. On September 30, the Commission postponed the effective date of the order to October 11, without further change in the order, and also expressly required only one day's[2] notice and publication of the pre-existing lower rates. On October 5, the carriers filed a new tariff to take effect November 16, 1965, with rates which were even higher than those in the controverted tariff. On October 11, the carriers complied with the cancellation order and published the pre-existing lower rates of May 1964. The increased rates in the October 5 schedules went into effect on the scheduled date of November 16, 1965.[3]
 
 
 12
 The pendency of the suit in the Three-Judge District Court now presented a problem to the carriers. The denial of the interlocutory injunction strongly suggested that they had only a slight chance of winning their case on the merits. If they proceeded to a hearing on the merits and lost, they would be liable on the bonds for a substantial amount of damages. Since they already had higher rates in effect which were no longer under investigation by ICC action, they proceeded to seek dismissal of the suit on the ground of mootness.
 
 
 13
 On September 5, 1968, the Three-Judge District Court on motion of the carriers dismissed the suit and counterclaims and discharged the bonds on the grounds that the rate increases mooted the issue of the validity of the cancellation order as between the ICC and the carriers. As to the shippers' counterclaims, the Court held that the ICC order of September 30, 1965, postponing the compliance date with the cancellation order to October 11, was retroactive to the original September 13 compliance date; thus there was no effective cancellation order during the period of the temporary restraining order (September 13 to September 29), and consequently the shippers were not injured and had suffered no damages which could be awarded by virtue of the operation of the temporary restraining order.
 
 
 14
 Following the issuance of the decision, the Government as statutory defendant and the Interstate Commerce Commission filed a joint statement with the court in which they denied that the September 30 order had any retroactive effect, contending that it was issued solely because of the court's stay of the original compliance date. In the light of this statement, the Three-Judge Court amended its original decision and accepted the Commission's position that there was no retroactive effect of the September 30 order, but concluded that the equities of the situation did not justify the granting of any relief to the shippers.
 
 
 15
 The question presently on this appeal is a relatively narrow one, namely whether the shippers are entitled to restitution from the carriers for the rates which were charged during the existence of the temporary restraining order, which rates were higher than those which could have been charged had the cancellation order gone into effect at the original compliance date of September 13.
 
 II. JURISDICTIONAL STATEMENT
 
 16
 Neither party to this appeal has challenged our jurisdiction, but because of the rather unusual circumstances of the case, a brief jurisdictional statement is appropriate.
 
 
 17
 The Three-Judge District Court below was convened pursuant to 28 U.S.C. § 2325 for the purpose of reviewing and considering the issuance of an injunction against the ICC order. Following the denial of the interlocutory injunction in September 1965, the carriers did not pursue judicial review of that order, but initiated new administrative proceedings before the Commission by filing new increased rates which became effective November 16, 1965. In September 1966, they moved in the District Court to strike the shippers' counterclaims and dismiss the suit on the grounds that the questions were now moot. The district judge denied the motion for the reason that the ancillary jurisdiction of the court had attached to determine the validity of the counterclaims, whose origin of course lay in the issuance of the temporary restraining order; the court reasoned that determination of the counterclaims required resolution of the validity of the ICC order. Accordingly, the Three-Judge Court convened in July 1968, to hear the merits of the suit, at which time the carriers again urged dismissal of the suit on the grounds of mootness. By its order of September 5, 1968, as modified by the further order of April 9, 1969, the Three-Judge District Court dismissed the suit as moot and denied the shippers' counterclaims on the grounds of a want of equity.
 
 
 18
 The private shippers perfected a direct appeal to the United States Supreme Court from the order of the Three-Judge Court and also a protective appeal to this court. The Government qua shipper appealed only to this court. The carriers, the Government as statutory defendant, and the ICC moved to dismiss the direct appeal as moot, and the Supreme Court dismissed it for want of jurisdiction. National Small Shipments Traffic Conference, Inc. v. Middlewest Motor Freight Bureau, 396 U.S. 111, 90 S.Ct. 395, 24 L. Ed.2d 304 (1969). This appeal is properly before us under the principles of Public Service Commission of Missouri v. Brashear Freight Lines, Inc., 312 U.S. 621, 61 S.Ct. 784, 85 L.Ed. 1083 (1941).
 
 
 19
 Under the principles of that case, the proper procedure in this case would have been for the Three-Judge District Court, upon dismissing the case against the ICC for mootness, to have referred the counterclaims for restitution to a single judge for disposition, as the claim for damages raised questions not within the statutory purpose of a three-judge district court. Nevertheless, the failure to follow this procedure does not invalidate the judgment, but merely renders a direct appeal to the Supreme Court under 28 U.S.C. § 1253 inappropriate, and review is properly in this court.
 
 III. CONSTRUCTION OF THE ICC ORDER
 
 20
 At the outset we must consider the construction and effect of the ICC order. The carriers contend that the ICC order neither rendered the tariff unlawful nor compelled a reduction in rates. If this contention is sound, then there is no need to consider the question of restitution, for there would be nothing to order restitution for. Unfortunately, because of the procedural posture of this case, we do not have the benefit in this Court of the presence of the Commission itself, since its immediate interest in the case was terminated with the denial of the interlocutory injunction. Therefore, in order to reach a decision on the issue, we must rely on the meager case law available and an analysis of the pertinent parts of the record. Neither party has referred us to any pertinent cases, though our own search has revealed a few indirectly relevant.
 
 
 21
 As a preliminary matter, it is necessary to make clear that in this part of the opinion we are dealing only with the construction and effect of the ICC order as it would operate as a valid administrative order. The lawfulness of the order is no longer at issue, and it must therefore be presumed valid. Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 512, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944). Nor is it material for purposes of this discussion that the carriers were allowed to collect the tariffs which were ordered canceled during the period of the temporary restraining order. The right to make that collection is not denied. Whether they have the right to keep the charges so collected is an entirely different matter, to be discussed below with reference to the availability of restitution. We must here determine whether, if the order went into effect, either because of carrier compliance or judicial enforcement, the result would be a reduction in the tariffs.
 
 
 22
 The proceedings involving this tariff arose under § 216(g) of the Interstate Commerce Act, 49 U.S.C. § 316(g), which provides in pertinent part as follows:
 
 
 23
 "Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, charge, or classification for the transportation of passengers or property by a common carrier or carriers by motor vehicle, * * * the Commission is authorized and empowered upon complaint of any interested party * * * to enter upon a hearing concerning the lawfulness of such rate, fare, or charge. . . . * * * At any hearing involving a change in a rate, fare, charge, or classification, * * * the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable."
 
 
 24
 When the carriers in this case filed their increased rates, the shippers filed a complaint protesting the increases and the ICC commenced a hearing under the above section. The proceeding terminated approximately 18 months later when the ICC issued its final order requiring the tariffs to be canceled. The grounds for this order were that the carriers had not sustained their burden of proof and had thus not shown that the schedules were just and reasonable.
 
 
 25
 At this point, explanation of the differences possible among various ICC orders in rate proceedings of this sort provide some illumination of the problem we face. There are numerous reasons why a tariff may be unlawful under the Interstate Commerce Act. A rate may be unlawful because it is unreasonable — e. g., it is too high to be just or too low to be compensatory. A rate, even though reasonable, may be unlawful because it is discriminatory — e. g., shippers similarly situated are charged different rates, each of which by itself might be reasonable. A rate, even though reasonable and nondiscriminatory among shippers, may be unlawful because it is prejudicial to other interests the Act protects — e. g., it threatens the solvency of competing forms of transportation. A rate, even though reasonable, nondiscriminatory, and nonprejudicial, may nevertheless be unlawful because it is not filed in accordance with the terms of § 317(a). Further variations on this theme might be orchestrated but are not necessary for our immediate purpose. The variation with which we are concerned is whether a rate that is not shown to be just and reasonable is unlawful. We believe it is.
 
 
 26
 The premise of this conclusion is the requirement of § 316(g) that the burden of proof is upon the carrier to justify any change in rates. The concept of burden of proof is a highly varying one depending on the circumstances of the issues involved; often it is merely a procedural rule which determines which party has the duty of producing evidence on a particular question. But often the concept is a far more significant one involving basically problems of substantive law. See 2 Davis, Administrative Law Treatise § 14.14 (1958). We think the instant statutory requirement is clearly substantive in nature, for the following reasons.
 
 
 27
 The Commission may order a tariff canceled solely on the grounds that the carriers have failed to meet their burden of proof, provided of course that the requisite findings are made to support the order. Chicago & E. I. R. Co. v. United States, 107 F.Supp. 118 (S.D.Ind. 1952), aff'd 344 U.S. 917, 73 S.Ct. 346, 97 L.Ed. 707 (1953). This is true even where the carriers have offered a considerable volume of evidence in support of the tariff. (This appears to have been conceded by the carriers in the proceedings below and is not contested here; their challenge to the validity of the Commission's order was not that they had met their burden of proof under the appropriate standards, but that the Commission had changed these standards without affording them sufficient notice.) Thus the burden of proof requirement under this statute is not merely a procedural one requiring the carriers to produce some evidence justifying their changed tariffs. The proof they offer must be sufficient to positively justify the tariffs.
 
 
 28
 The carriers contend that even though they have failed to meet their burden of proof, the tariff in issue is nevertheless lawful. That conclusion would not follow, even if they had met the burden of proof for purposes of § 316 (g). For it is well established that when the Commission holds a hearing on the lawfulness of a tariff and refuses to cancel it, even with a specific finding that it is not shown to be unlawful, it is not thereby converted into a lawful tariff. "* * * [T]hey stand only as carrier-made rates which * * * leaves them open to possible recovery of reparations." Interstate Commerce Commission v. Inland Waterways Corp., 319 U.S. 671, 687, 63 S.Ct. 1296, 1305, 87 L.Ed. 1655 (1943). If the fact that the carrier sustains its burden of proof sufficiently to convince the Commission to allow the tariffs to stand as carrier-made rates does not thereby convert them to lawful rates, it is self-evident that where the proof fails even to justify them as carrier-made rates and the Commission orders them canceled, they cannot be lawful.
 
 
 29
 To sustain the carriers' contention on this issue would mean that the Commission could order lawful rates canceled. That of course is contrary to the whole scheme of the rate-making process under the Interstate Commerce Act. The rationale of that process is that the carrier has the right to fix its own rates at any level it sees fit, so long as it complies with the terms of the Act and is, upon challenge, able to show that its rates are just and reasonable. The Commission, proceeding under § 316(g), investigates the "lawfulness" of the rates. Hence, if the Commission orders a tariff canceled, it must be because it was unlawful. If a tariff may be canceled because the carrier failed to sustain its burden of proof, then that failure must render the tariff unlawful.
 
 
 30
 It must be emphasized that we are here dealing with the lawfulness of the tariff following the effective date of the Commission's cancellation order. If the cancellation order, based on the finding that the tariffs were not shown to be just and reasonable, did not mean that the tariffs for the future would be unlawful, then the entire proceedings would be meaningless. The Commission did not let the tariffs stand as "carrier-made rates." Nor did it, as it has in some cases, order the tariffs canceled without prejudice to their amendment. See Accelerated Transport-Pony Express, Inc. v. United States, 227 F.Supp. 815 (D.Vt.), aff'd, 379 U.S. 4, 85 S.Ct. 43, 13 L.Ed.2d 21 (1964). Nor did it leave open to the carriers the option of producing additional evidence to justify these tariffs. Positive cancellation was required.
 
 
 31
 Cases dealing with orders of the Commission in this form have not addressed themselves specifically to this question of whether the tariffs ordered canceled were thereby rendered unlawful. Nevertheless, they seem to have proceeded upon this assumption, consistently with the above discussion. Language from the following two cases is indicative of this approach:
 
 
 32
 "Upon submission and study the Commission reported that the new classification was unlawful, saying:
 
 
 33
 `We conclude that the respondents [carriers] have failed to sustain their statutory burden of proof.
 
 
 34
 `We find that the proposed changed rating has not been shown to be just and reasonable.'"
 
 
 35
 Overnite Transportation Co. v. United States, 266 F.Supp. 88, 90 (E.D.Va.1967) (emphasis added).
 
 
 36
 "But where, as here, the carrier has presented impressive evidence to support the proposed rate, the Commission may not hold the rate unlawful upon the mere statement that the carriers have not sustained their burden of persuasion." New York Cent. R. Co. v. United States, 99 F.Supp. 394, 401 (D.Mass.), aff'd 342 U.S. 890, 72 S.Ct. 201, 96 L.Ed. 667 (1951) (emphasis added).
 
 
 37
 See also Ringsby Truck Lines, Inc. v. United States, 263 F.Supp. 552 (D.Colo. 1967), app. dis., 389 U.S. 576, 88 S.Ct. 689, 19 L.Ed.2d 775 (1968); Baltimore & O. C. T. R. Co., v. United States, 279 F.Supp. 270 (N.D.Ill.), aff'd, 389 U.S. 88, 88 S.Ct. 253, 19 L.Ed.2d 255 (1967).
 
 
 38
 Due to the technicality of the concepts involved, as well as the distinct possibility of future misinterpretation of the import of this decision, it seems necessary here to expressly limit the sense in which we are applying the term "unlawful" to these tariffs. In holding that the tariffs are unlawful, we are not expressing any affirmative judgment that the rates embodied in them are in any substantive way violative of the Act — e. g., that they are unreasonably high or discriminatory. Such a judgment lies solely within the province of the Interstate Commerce Commission. Nor does this holding imply that the tariffs were unlawful in any sense whatsoever prior to the Commission's final order. This issue is not before us in this case, limited as we are solely to the period of the temporary restraining order following the effective date of the final order (September 13 to 29, 1965). Nor does the term "unlawful" in this context mean that the carriers could not collect the rates in the tariff during the period of the temporary restraining order; that they may or may not keep them after collection is discussed below in regard to the availability of restitution. The conclusion that the tariffs were unlawful is restricted to the sense that by virtue of the Commission's cancellation order, as it operated prospectively, the carriers no longer had the right to maintain that particular tariff; maintenance of the tariff in violation of the order was unlawful.
 
 
 39
 Having concluded that the cancellation order rendered the particular tariffs here in issue unlawful, we are next faced with the question of what was the actual effect of the order on the rates which the carriers could charge. The carriers contend that the effect of the order did not require them to reduce their rates. We pause to note here that, prior to the carriers' raising this contention on appeal, there appears to have been absolutely no confusion on anybody's part as to the meaning of the Commission's order. The carriers, the shippers, the Commission, the Government, and the trial court all operated on the assumption that the effect of the Commission's order was to require the carriers to cancel the increases and to revert, for some period of time at least, to the immediately prior rate levels. The insistence of the carriers now that the order did not require such a reduction is disingenuous, to say the least. Under normal circumstances, we would not feel obliged to deal with such a contention raised for the first time on appeal, especially where it is directly contrary to all the proceedings below. Nevertheless, since the proceedings below were focused primarily on the validity of the Commission's order, rather than the problems of restitution, we feel constrained to examine the issue briefly. There is no case law on the subject to which we have been directed by the parties, nor have we found any. Lack of authoritative decisions indicates an accepted interpretation of the regulatory scheme whereby failure to justify rate increases accompanied by an order of cancellation would result in a reduction in rates.
 
 
 40
 First, account may be taken of the Commission's proceedings in this case. The order of investigation which initiated the proceedings, dated June 28, 1963, was directed at the proposed increased less-truckload rates. In its final report, reported at 325 I.C.C. 106 (1965), the Commission made clear that its findings were directed solely at the carriers' increases. "The increases became effective on September 7, 1963, and will be referred to herein as the proposed increases." Id. at 107. In the discussion section, the Commission again emphasized its concern, not with overall high rates, but with carrier increases:
 
 
 41
 "Numerous motor carrier general increase proceedings involving strong shipper opposition have been considered in the past several years. As a consequence the evidence presented to justify a general increase in rates has been subjected to close scrutiny. * * * [T]he evidence is not convincing that this less-than-truckload traffic, which generally is not susceptible of diversion to other modes of transportation, should be subjected to an additional increase barely 1 year after the last increase became effective." Id. at 121-122.
 
 
 42
 The Commission's specific finding was that the "increases are not shown to be just and reasonable." And the final order, dated August 31, 1965, denying further postponements and rehearings, again said that the "proposed increases found not shown to be just and reasonable have been ordered cancelled."
 
 
 43
 It is quite evident from this that the Commission order did not mean that the carriers' entire rate structure was not just and reasonable, but only that the most recent increase was not shown to be just and reasonable. The obvious conclusion to be drawn is that the increases to be canceled would leave the carriers with the rate structure as it existed just prior to the increases. That the carriers understood this exactly is clear both from the letter written to the Commission by carrier's Attorney Feldman on August 30, 1965, and by their subsequent court suit.
 
 
 44
 In their complaint filed instituting a suit against the Commission order and applying for a temporary restraining order, the carriers specifically alleged that the order "requiring cancellation of increased rates and minimum charges to become effective September 13, 1965, would cause irreparable injury to plaintiffs * * *." (emphasis added). In the affidavit in support of the motion for the temporary restraining order, the carriers reiterated the charge that the cancellation of the increases would cause irreparable damage, and presented specific figures indicating their financial position if the increases were left in their rates compared to the effect of omitting them from the rates if the order went into effect. Further explication of the extensive evidence in the record to this effect is unnecessary to this opinion.
 
 
 45
 Finally we take specific note of the findings and order entered by the Three-Judge Court denying the interlocutory injunction, Order of September 29, 1965. Throughout this order, the court consistently refers to the rate increases. Of specific interest here is the finding VII(c):
 
 
 46
 "That the balancing of the equities in considering the magnitude of the losses and injury to the public if the interlocutory injunction is granted and if the Commission's order is sustained by the Court, as compared with the losses to the carriers if the injunction is not granted, with the remote possibility of the Commission's order being set aside, adequately justifies this Court, on this showing, in denying the motion for an interlocutory injunction."
 
 
 47
 This finding is obviously based on the premise that the Commission's order requires a reduction in the carriers' rates. Otherwise there could be no losses to the public.
 
 
 48
 Despite this seemingly unanimous agreement by all parties in the trial litigation that the Commission order required cancellation of the rate increases, resulting in a reversion to the prior rate levels, the carriers now insist on appeal that that was not the effect of the Commission order. Just exactly what was the effect of the order in the carriers' view is left uncertain, but the import of their position as quoted here leaves open several possibilities:
 
 
 49
 "The tariff schedules at issue were not `rate increase schedules' as repeatedly characterized by the shippers * * * — but all schedules — and there then left no underlying, pre-existing schedules of rates and charges which would automatically have become effective upon cancellation of the schedules which are the subject of the case at bar. In other words, the challenged Commission order did not direct cancellation of merely an increase, or addon, leaving an underlying rate structure, but swept away all basis for any charges for transportation services." (Carriers' Brief, p. 10).
 
 
 50
 "By the order of cancellation the carriers were left entirely free to publish new rates, and those new rates could conceivably have been higher than, the same as, or lower than, the rates ordered cancelled." (Carriers' Supplemental Brief, p. 8.)
 
 
 51
 At this point we pause in the argument to note that the ensuing analysis proceeds on the assumption that as of the September 13 effective date, the Commission order would have caused cancellation of the tariffs in question absent the temporary restraining order, either because of its self-executing nature or because of carrier compliance. The possibility that the carriers could have wilfully failed to comply with the order, and thereby blocked its effectiveness without becoming liable for refunds would make impotent the whole congressional scheme for review and consideration of tariffs.
 
 
 52
 The Commission's order of cancellation was served March 16, 1965, to become final April 14, 1965. Subsequently, the compliance date of the order was extended to September 13, 1965. Throughout this period, the carriers were free to publish new tariffs with ample time for the thirty days notice requirement to be met. Whether those new tariffs could have been higher than, the same as, or lower than, the schedules ordered canceled is immaterial, for the fact of the matter is that they did not publish any new tariffs. (The record makes clear that at least one reason for failing to publish new tariffs which would have been higher was the carriers' fear that the Commission would suspend them. This is also a fair indication that the carriers recognized the actual import of the cancellation order.) When the compliance date of September 13 arrived, the carriers had not published any new tariffs and the increased tariffs were to be canceled. If their argument that cancellation would leave them with no rates whatsoever which could be charged is correct, we could only conclude that as of that date they were bound to quit offering services to the public at all because of their dereliction in failing to publish new tariffs. But since even the shippers do not suggest such a harsh result, and since it seems rather contrary to common sense, we conclude only that the pre-existing lower rates should have come into effect at that time, either by operation of law or by the affirmative action of the carriers.
 
 
 53
 In concluding that, in the absence of any carrier action to establish new rates where a tariff is found unlawful, the last lawful pre-existing rates are the effective rates to be applied by a court in considering restitution, we find an analogy in the case of Chicago, M., St. P. & P. R. Co. v. Alouette Peat Products, Ltd., 253 F.2d 449 (9th Cir. 1957). In that case, the carriers published increased rates which the court found to be unlawful because they failed to comply with the statutory 30-day notice requirement. The court acknowledged that the carriers were entitled to collect this rate because it was the only published rate on file, but ordered restitution to the shippers to the extent that this rate exceeded the immediately preceding one, because the higher rate had not been lawfully established.
 
 
 54
 "No change having been legally made in the rate which existed before Ex Parte 162 [the one published on less than statutory notice], that rate was the only existing, legally established rate and the Court was bound to apply it." 253 F.2d at 456.
 
 
 55
 To summarize our holding on this aspect of the case, we conclude that the Commission order canceling the tariffs in issue rendered those tariffs unlawful as of the effective date of the order, with the consequence that the immediate prior lower rates should have been in effect and would have been in effect had not the temporary restraining order been issued.
 
 
 56
 IV. RESTITUTION AS A REMEDY FOR LOSSES SUFFERED BY VIRTUE OF AN INJUNCTION
 
 
 57
 The issuance of an injunction will in many cases cause financial losses to interested parties as well as prevent irreparable injury to the procurers. More importantly in cases such as this, where the restraint is directed against an order of an administrative agency charged with regulating rates to be charged to the public at large, the injunction may cause substantial losses to the general public which can never be adequately compensated. In such cases, it is the duty of the court issuing the injunction to take necessary measures to protect the interests of parties before it, as well as the public interest. (This was done in this case by the issuing judge prudently requiring a substantial bond before issuing the temporary restraining order. The temporary restraining order is customarily issued, and usually ex parte, to maintain the status quo pending a detailed review on the merits.)
 
 
 58
 For some time, it was thought to be the law in the federal courts that the only remedies available to parties injured by the issuance of an injunction were an action for damages on the injunction bond, if one had been required, in which case the amount recoverable was limited to the amount of the bond, or, in the absence of a bond, an action for malicious prosecution where applicable. Russell v. Farley, 105 U.S. 433, 26 L.Ed. 1060 (1881). The substantial limitations inherent in these remedies are readily apparent.
 
 
 59
 But in 1919, the Supreme Court significantly expanded the protection to be accorded injured parties by allowing recovery in the nature of restitution in cases where that remedy might be appropriate. Arkadelphia Milling Company v. St. Louis S. W. Ry. Co., 249 U.S. 134, 39 S.Ct. 237, 63 L.Ed. 517 (1919). The principles enunciated in Arkadelphia are central to the resolution of this case, and hence it will be examined in detail. The state of Arkansas, through an administrative agency, established rates to be charged by railroads for intrastate transportation of freight and passengers. The railroads brought suit in federal court, attacking the rates on the grounds that they were confiscatory. The district court issued an injunction, conditioned on a bond, restraining enforcement of the rates and ultimately issued a permanent injunction on the grounds that the rates were confiscatory. Upon entering the final decree, the bonds were dissolved. This decision was appealed, and the Supreme Court reversed the decree, holding that while the complaining railroads were justified in criticizing many of the tests applied by the State in determining the rates, they had failed to sustain their burden of proof that the rates were confiscatory. The complaint was ordered dismissed without prejudice, Allen v. St. Louis, I. M. & S. Ry. Co., 230 U.S. 553, 33 S.Ct. 1030, 57 L.Ed. 1625 (1912). On remand, the district court entered a decree in conformity with the mandate and referred the case to a master to determine the award of damages. The master awarded damages, measured by the excess rates charged by the railroads over those prescribed by the state commission, against the railroads and the sureties on the bonds for the period from the issuance of the injunction to the entry of the original decree and also for the period between the entry of the original decree and the entry of the final decree conforming with the mandate. The district court affirmed the master's report and awarded judgment accordingly. On appeal to the Supreme Court, this judgment was affirmed with the modification that the sureties were not liable for the period following the final decrees since the bonds had been dissolved at that time.
 
 
 60
 The railroads in Arkadelphia made three arguments which are pertinent to the instant case. First, they argued that the higher charges in force prior to the issuance of the permanent injunction were lawful charges by virtue of the temporary injunction; that the decision reversing the issuance of the permanent injunction operated prospectively only and did not determine that the temporary injunction was wrongfully issued; and that the condition of the bonds required a final decision on this issue in order to establish liability to the shippers. The Supreme Court disposed of this contention as follows:
 
 
 61
 "But this is to construe the bonds according to the letter and not according to the substance. The state statute and the orders of the Railroad Commission entitled shippers to the benefit of the rates thereby established; and they were thus entitled at all times except as it became necessary to stay the operation of the rates by equitable process in order to permit of a judicial investigation into the question of their adequacy. The burden of proof to show them inadequate was upon the railway companies; and when they failed to sustain this burden they at the same time showed that the injunctions ought not to have been allowed." Arkadelphia Milling Co. v. St. Louis S. W. Ry. Co., 249 U.S. 134 at 144, 39 S.Ct. 237 at 2411 (1919).
 
 
 62
 Secondly, the railroads argued that as to damages occurring after the issuance of the permanent injunction, the reference to the master was only for the purpose of determining damages on the bonds, which liability was discharged with the issuance of the permanent injunction, and that the permanent injunction itself created no liability on the part of the railroads to the shippers. This argument led to the Court's significant holding that these damages were recoverable on the theory of restitution. This holding was based on the "principle, long established and of general application, that a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby." Id. at 145, 39 S.Ct. at 242. (See American Law Institute, Restatement of Restitution, § 74 (1937)).
 
 
 63
 Finally, the railroads argued that since the reversal of the district court's decree was "without prejudice," the rights of the parties were left in doubt and thus there was no basis for the award of damages. The Court held that:
 
 
 64
 "* * * [T]he rights of the present shippers were so clear as to make an allowance of damages upon the injunction bonds and restitution upon the reversal of the decrees manifestly their due. That the reversal was `without prejudice' did not deprive the decrees of conclusiveness as to past transactions, but only prevented them from being a bar to future suits for injunction upon a showing of changed conditions." Id. at 147, 39 S.Ct. at 242.
 
 
 65
 The carriers in the instant case seek to distinguish Arkadelphia on the following grounds. First, they argue that the jurisdictional bases for judicial review and restraint of the orders are different; in Arkadelphia, the jurisdiction of the court was founded on the denial of a constitutional right (confiscation of property in violation of due process), whereas here the right of review is accorded by statute (28 U.S.C.A. §§ 2284, 2324, 2325). We fail to perceive how this distinction makes a difference. In either case, the jurisdiction to issue the injunction is founded on traditional equity powers, and concomitant with the power to issue the injunction is the power to restore the parties to their rightful positions if the injunction is wrongfully issued. Surely it could not be contended that because Congress required that injunctions restraining orders of the Interstate Commerce Commission be issued by a three-judge court, instead of a single judge, it thereby expanded or contracted rights of the parties affected by that injunction. Secondly, the carriers argue that the lower rate was legislatively prescribed in Arkadelphia, whereas in this case there was no lower rate prescribed. We have disposed of this contention above. Finally, they contend that restitution was proper in Arkadelphia because there was no other remedy available in that case, while here § 304a of the Interstate Commerce Act provides another remedy. We will deal with this contention below in connection with other defenses suggested by the carriers.
 
 
 66
 Following the decision in Arkadelphia, the Supreme Court applied its principles in numerous cases. In a case involving municipal regulation of gas utility rates, where a district court's temporary injunction enjoining enforcement of the rates followed by a denial of a permanent injunction was affirmed as modified by the Supreme Court, it was held in a subsequent decision that the district court had jurisdiction to order refunds, through a special master, of the excess rates collected by the gas company by virtue of the temporary injunction, and indeed that retention of such jurisdiction was required by the principle of Arkadelphia. Ex parte Lincoln Gas & Electric Light Co., 256 U.S. 512, 41 S.Ct. 558, 65 L.Ed. 1066 (1921).
 
 
 67
 Of particular interest with respect to the instant case is a contention made by the gas company regarding the extent of the period for which restitution should be required. The district court entered its first decree upholding the validity of the rate ordinance on September 23, 1915, and dismissed the bill finally. The temporary injunction was continued, however, on a supersedeas bond to permit appeal by the gas company. On that appeal, the Supreme Court affirmed the district court's dismissal of the bill on the grounds that the rates were not proved to have been confiscatory during the period then involved, approximately 1908 to 1915. However, the Court took judicial notice that labor costs and returns on capital had increased substantially since the end of World War I and modified the dismissal to provide that it would be without prejudice to the institution of a new suit proving confiscation subsequent to the date of the final decree, September 23, 1915. Lincoln Gas & Electric Light Co. v. Lincoln, 250 U.S. 256, 39 S. Ct. 454, 63 L.Ed. 968 (1919).
 
 
 68
 On remand, the district court ordered restitution for the period of the temporary injunction up to the date of the final decree, and also for the period following the final decree while the injunction was in effect pending the appeal. Appealing this order, the company contended that there was no liability for excess charges after the date of the final decree, because by virtue of the Supreme Court's prior modification order, the validity of the ordinance was finally determined only up to the date of the final decree; since the bill was dismissed without prejudice to a new suit subsequent to that date there was no final adjudication of the validity of the ordinance rates subsequent to that date. But the Supreme Court held that restitution was proper for this period also, because the ordinance rate was presumptively valid and binding until the company successfully concluded a suit showing that it was noncompensatory. Ex parte Lincoln Gas & Electric Light Co., 256 U.S. at 518, 41 S.Ct. 558.
 
 
 69
 Remedies available to parties who might be injured by the issuance of an injunction restraining an agency order were further expanded by the decision of the Supreme Court in Inland Steel Co. v. United States, 306 U.S. 153, 59 S.Ct. 415, 83 L.Ed. 557 (1939). In that case, the Interstate Commerce Commission found that certain allowances granted shippers by railroads were discriminatory and unlawful and ordered them canceled. The shippers sought an injunction restraining this order. The district court granted the injunction, but conditioned it on the payment of the contested allowances into a special account, subject to the order of the court, although neither the ICC nor the railroads requested such a condition. The Supreme Court held that the imposition of the condition was within the equity powers of the court in order to protect restitutional rights, relying on Arkadelphia and Ex parte Lincoln Gas. Upon affirmance of the commission's order, the special account was ordered restored to the railroad.
 
 
 70
 Finally, in reviewing Supreme Court cases on this issue of restitution, we may note that the Court has emphasized the importance of protecting the interests of parties adversely affected by the issuance of injunctions against administrative orders by reversing decisions which failed to award restitution or damages where it was clearly due. See Baltimore & Ohio R. R. Co. v. United States, 279 U.S. 781, 49 S.Ct. 492, 73 L.Ed. 954 (1929); Public Service Commission of Missouri v. Brashear Freight Lines, Inc., 312 U.S. 621, 61 S.Ct. 784, 85 L.Ed. 1083 (1941).
 
 
 71
 The principles enunciated in these Supreme Court decisions have been applied in numerous cases before the Courts of Appeals. Among those cases, we take specific note of two decided by our own Circuit. Berthold-Jennings Lumber Co. v. St. Louis, I. M. & S. Ry. Co., 80 F.2d 32 (8th Cir.), cert. denied, 297 U.S. 715, 56 S.Ct. 591, 80 L.Ed. 1001 (1935), involved a receivership proceeding in which the railroad was placed in receivership and a special master was appointed to determine claims against it. Certain shippers appeared in the proceeding before the special master and filed claims for rate overcharges against the railroad and also sought a preference for those claims. The alleged overcharges occurred under the following circumstances. The state of Missouri established by legislative action a schedule of maximum freight rates. The railroads obtained an injunction against those rates and during the period of injunction charged higher rates than permitted by the statute. The Supreme Court of Missouri ultimately sustained the validity of the legislation and dissolved the injunction. Applying the principles discussed above, this Court allowed the claims for overcharges against the railroads in the receivership proceeding, although for reasons not here material the demand for a preference was not allowed. Berthold-Jennings Lumber Co., supra at 40.
 
 
 72
 A somewhat different problem confronted this Court in the case of Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 154 F.2d 909 (8th Cir.), cert. denied, 329 U.S. 761, 67 S.Ct. 110, 91 L.Ed. 656 (1946). There the pipe line company had challenged an order of the FPC ordering reduced rates on the transportation and sale of natural gas. A stay order against the Commission was granted by the Court of Appeals in order to permit the company to obtain review, but the stay was conditioned on the payment into court of the excess charges pending final determination. The Commission order was ultimately upheld and the Court was then faced with the problem of distributing the impounded funds. The specific question involved in Panhandle was whether the expense of distribution should be borne by the pipe line company or whether it should come out of the impounded funds, in effect making the expense of distribution fall on the consumers entitled to restitution. This Court held, relying in part on Inland Steel, supra, that the expense of distribution should fall on the company. This decision is consistent with the general principle that a party who obtains a benefit from an improperly issued injunction has the duty to restore that benefit to those who have been injured by the injunction.
 
 
 73
 Finally, attention may be given to the case of Accelerated Transport-Pony Express, Inc. v. United States, 227 F.Supp. 815 (D.Vt.), aff'd, 379 U.S. 4, 85 S.Ct. 43, 13 L.Ed.2d 21 (1964). In that case, carriers challenged an order of the ICC finding that the carriers' rates were not shown to be just and reasonable because certain charges for short hauls were higher than those for long hauls and ordering the tariffs canceled to the extent of this discrepancy. A temporary restraining order was obtained by the carriers, but on the final decision on the merits, a three-judge district court sustained the ICC's order and dismissed the complaint. The proceedings following this dismissal are not reported, but counsel has made available to this court the pertinent documents which indicate substantial relevance to this case. Following the dismissal, a single judge of that court ordered a reference to a master pursuant to the bond required on the temporary restraining order in order to determine damages sustained by shippers and receivers of freight because of the temporary restraining order. In conjunction with the reference, the court ordered the shippers to file an accounting of all monies collected by them in excess of rates or charges which would have been applicable had the ICC's order not been restrained.
 
 
 74
 In the course of the proceedings before the master, it became apparent that the shippers and the carriers were in substantial disagreement over the rate basis of the accounting, and also that the accounting itself would amount to a considerable expense on the part of the carriers. Consequently, a settlement agreement was entered into by which the carriers agreed to pay approximately $469,000 into a fund to be administered by a trustee; out of the fund the trustee was to pay litigation expenses of the prior suit and also to pay claims for overcharges proved by injured parties. The government assented to this settlement, and the district court approved the stipulated agreement and discharged the bonds accordingly.
 
 
 75
 The carriers in the instant case attack the relevance of Accelerated Transport as precedent. They contend that there was never any hearing on the primary issue of liability to make refunds, that there was never any decision that there was such liability, and that the stipulation itself does not confess such liability.
 
 
 76
 Underlying this argument is the suggestion that the only reason the settlement was entered into was that the carriers were under coercion because of the even more expensive task of making an accounting to the master. However, the conclusion is inescapable that the reference to the master and the stipulation that was accepted in satisfaction of the liabilities and rights entailed reflects that court's decision that the carriers had a duty to answer for the damages caused by the improvident issuance of the temporary restraining order. We reject the position that the stipulation was a product of coercion; if the carriers believed that the reference to the master was improper, that order was appealable by means of a writ of mandamus. See 5 Moore's Federal Practice ¶ 53.05 [3] (1969). Accelerated Transport is clearly entitled to precedential value on this issue.
 
 V. THE CARRIERS' AFFIRMATIVE DEFENSES
 
 77
 Against the foregoing authority, the carriers make the following affirmative contentions, based primarily on their interpretation of Part II of the Interstate Commerce Act: (1) first, they argue that restitution to shippers is precluded under the Interstate Commerce Act as interpreted by the Supreme Court, relying on Atlantic Coast Line R. R. Co. v. Florida, 295 U.S 301, 55 S.Ct. 713, 79 L.Ed. 1451 (1935); (2) secondly, they argue that § 304a of the Act provides an exclusive remedy of which the shippers have not availed themselves; (3) third, they argue that to order restitution in this case would contravene the express provisions of the Act that carriers may not make refunds to shippers from the published tariffs.
 
 
 78
 A. Atlantic Coast Line R. R. v. Florida.
 
 
 79
 In Atlantic Coast Line, supra, the Supreme Court denied restitution to shippers; the facts of the controversy are as follows. Rail carriers in Florida had voluntarily established certain intrastate rates, which were later approved as maximum rates by an order of the Florida State Commission. The Interstate Commerce Commission instituted an investigation in which it found that those rates were confiscatory and resulted in discrimination against interstate commerce. It prescribed a new schedule of rates higher than those set by Florida. Florida sought judicial review of the ICC order, and the Supreme Court set aside the order on the grounds that the Commission had not made adequate findings. Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291 (1931). The Commission then held a new hearing, made new findings and prescribed its same higher rate schedule for substantially the same reasons as before. The Supreme Court affirmed this second order. Florida v. United States, 292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. 1077 (1934). The State of Florida and other shippers meantime brought suit in the district court for restitution of the difference between the higher rates charged by the railroads and the approved state rates for the period between the issuance of the first invalid order of the ICC and the date of its ultimate reversal because of procedural defects in not supplying adequate findings justifying the order. The district court allowed partial restitution of these rates. The Supreme Court, in an opinion by Justice Cardozo, reversed, holding that the shippers were not entitled to restitution on these facts. Atlantic Coast Line R. R. Co. v. Florida, 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451 (1935).
 
 
 80
 Justice Cardozo's opinion specifically recognized that the principle of restitution was applicable to the situation, but held that the equities of that situation favored permitting the carriers to retain the charges, "* * * restitution is without support in equity and conscience." Id. 312-313, 55 S.Ct. 718. Three reasons were advanced as to these equitable considerations. First of all, the carriers had collected the higher rates by virtue of their compliance with the ICC order. The court noted that the carriers were not free to refuse obedience to the order. Secondly, the factual basis for the ICC order setting higher rates — the discrimination against interstate commerce by the lower rates — existed in fact at the time of that first order; and this discrimination was declared unlawful by statute. The order was invalid for procedural reasons only (incomplete and inadequate findings), not because it was based on an improper determination of the facts. In other words, the factual justification for the higher rates was in existence at all times and had been specifically approved by the ICC. Thirdly, the lower rates which the shippers contended should be the measure of restitution were confiscatory. The Court observed: "A situation so unique is a summons to a court of equity to mould its plastic remedies in adaptation to the instant need." 295 U.S. at 316, 55 S.Ct. at 719. Furthermore, the Court was expressly motivated in allowing the carriers to retain the higher rates by considerations of the deference due to the expertise of the ICC and of accommodation of the judicial process to the administrative process. Thus, to affirm the retention of the higher rates would be consistent with the action of the ICC, whereas to order restitution, in addition to being inequitable, would be inconsistent with the ICC's action.
 
 
 81
 The facts of the instant case contrast sharply with those of Atlantic Coast Line. Here, the carriers have charged higher rates, not in compliance with an ICC order, but in spite of that order and only by the use of judicial restraint subsequently held to have been improvidently granted. The ICC has ordered the increases in this case canceled, rather than ordering lower rates raised. In Atlantic Coast Line, the Commission found as a fact that the higher rates were justified, and this finding was ultimately sustained by the courts. Here the Commission found that the higher rates were not justified, and on the hearing for the interlocutory injunction, the court found that the carriers presented no evidence suggesting that this finding would likely be disturbed. The lower rates to which restitution was sought in Atlantic Coast Line were found by the Court to be confiscatory upon satisfactory proof presented by the carriers. Here the carriers contended both before the Commission and the district court that the lower rates would be confiscatory, but failed to carry their burden of proof in either forum. Finally, in Atlantic Coast Line, to order restitution would have been inconsistent with the administrative process, whereas here restitution is not only consistent, but as developed more fully below, denial of restitution would be inconsistent with the administrative process.
 
 
 82
 Implicit in the carriers' reliance upon Atlantic Coast Line is the assumption that that case held that under no circumstances could restitution be awarded to shippers. This assumption is without foundation either in the language of that opinion or in subsequent interpretations of that decision. Indeed, subsquent decisions of both the Supreme Court and other courts have read the case to authorize reference of certain issues to an appropriate administrative agency in order to aid courts in devising restitutional remedies for parties before them in cases involving those agencies, even where the agency itself has no authority to award such restitution. The authority for this position follows from Justice Cardozo's reliance on the first invalid ICC order finding the rates to be unjustly discriminatory.
 
 
 83
 The case most nearly analogous to the present situation is United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939). Involved in that case was an order of the Secretary of Agriculture under a statutory scheme of regulation of stockyards (7 U.S.C. §§ 181-229) similar to that of the Interstate Commerce Act regulating motor carriers. The stockyard owners were required to charge rates which were "just, reasonable, and non-discriminatory, and any unjust, unreasonable, or discriminatory rate of charge is prohibited and declared to be unlawful." Cf. 49 U.S.C. 316(d) (Motor Carriers). The rates were to be established by filing a schedule with the Secretary. The Secretary, upon complaint or on his own initiative, could investigate the schedules, and if he found that they violated the Act, could prescribe new ones for the future; but if the investigation was on his own initiative, he could not award reparations for the past rates. Acting on his own initiative, the Secretary set aside a schedule of rates and prescribed lower ones. Suit was commenced to enjoin the order, and the district court issued a temporary restraining order on the condition that the stockyard owners deposit the difference between the two rates in a fund in court. The Supreme Court held the Secretary's order invalid because the Secretary had failed to accord the stockyard owners the full hearing required by the Act, and the case was remanded for further proceedings. Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936); 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938). Thereupon, while new proceedings were pending before the Secretary, the district court ordered the impounded fund to be returned to the owners, on the grounds that the lower rates had been required by an invalid order. The Supreme Court reversed, relying in part on Arkadelphia, Ex parte Lincoln Gas, Baltimore & Ohio R. Co., and Inland Steel Co., all discussed above. Most significant for purpose of this discussion was its reliance on Atlantic Coast Line.
 
 
 84
 Two principles governed the Court's decision. First of all, judicial review of administrative action should be coordinated as nearly as possible with the agency action so as to attain the ends of the statute. Secondly, "in exerting its extraordinary powers [as a court of equity] to stay execution of a rate order," the court had the duty to protect both the litigants and the public. 307 U.S. at 191, 59 S.Ct. at 800. "[A] court of equity should be astute to avoid the use of its process to effectuate the collection of unlawful rates, and equally so to direct it to the restitution of rates which it has taken into its own custody, once they are shown to have been unlawful." Id. at 194, 59 S.Ct. at 801. Of course, as the Supreme Court itself subsequently noted, the fact that in fashioning its remedy the district court had ordered payment of the fund into court is immaterial to the basic underlying principles. See Addison v. Holly Hill Co., 322 U.S. 607, 621, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944). Although the Secretary himself could not order restitution, Atlantic Coast Line was read as authority for him to make a suitable order which would justify the court in awarding restitution to the customers of the stockyards. 307 U.S. at 192 et seq., 59 S.Ct. 795.
 
 
 85
 It would unduly prolong this already extensive opinion to discuss in detail all the other cases dealing with Atlantic Coast Line. It will be sufficient to point out that none of them has interpreted that case to preclude restitution in a case where it is clearly warranted under facts similar to the instant situation. See, e. g., Federal Power Commission v. Interstate Natural Gas Co., 336 U.S. 577, 583, 69 S.Ct. 775, 93 L.Ed. 895 (1949); Berthold-Jennings Lumber Co. v. St. Louis, I. M. & S. Ry. Co., 80 F.2d 32, 40 (8th Cir. 1935); Williams v. Washington Area Metropolitan Transit Commission, 134 U.S.App.D.C. 342, 415 F.2d 922, 942-944 (1968), cert. denied, D. C. Transit System v. Williams, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 733 (1969); Bell v. United States, 49 F.Supp. 505 (E.D.La.1943).
 
 
 86
 B. T.I.M.E. Inc. v. United States and § 304a
 
 
 87
 We turn now to the contention that restitution is precluded in this case because an exclusive remedy is provided by 49 U.S.C. § 304a. This section of the Act was passed in 1965 in response to the Supreme Court's decision in T. I. M. E., Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959), upon which the carriers also rely as precluding restitution. In order to understand fully this contention, it is necessary to examine the legislative history of Part II of the Interstate Commerce Act, 49 U.S.C. §§ 301 et seq.
 
 
 88
 As originally passed in 1887, the Interstate Commerce Act established the Interstate Commerce Commission to regulate rail transportation. That statute is now Part I of the Act, 49 U.S.C. §§ 1300. In 1935, the powers of the Commission were significantly expanded to encompass the regulation of motor carriers by the passage of the Motor Carrier Act, now Part II of the Interstate Commerce Act. In many ways, the two sections of the Act were parallel, but in other ways significant to the instant problem they were substantially different. Rights and remedies of common carriers and their customers had been the subject of a considerable body of common law devised by the courts. One of the problems faced by the Congress was how to reconcile this common law doctrine with the new statutory regulatory scheme. Part I of the Act contained several sections providing for both judicial and administrative remedies for persons damaged by failure of the railroads to comply with the Act. 49 U.S.C. §§ 8, 9, 13(1), 16. In contrast, Part II provided only a remedy for overcharges by a motor carrier, overcharges being charges in excess of the filed rates. 49 U.S.C. § 304a. Both sections of the Act also contained savings clauses relating to common law remedies which differed considerably. 49 U.S.C. § 22, relating to rail carriers provides that "nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies." On the other hand, the savings clause relating to motor carriers, 49 U.S.C. § 316(j), is more restrictive: "nothing in this section shall be held to extinguish any remedy or right not inconsistent herewith."
 
 
 89
 For purposes of this discussion, the remedies with which we are most concerned are those for overcharges, reparations, and restitution. The differences between the three are significant. As noted above, overcharges are charges made by carriers in excess of the published tariffs, and both parts of the Act provided specific remedies for these. Tariffs under both sections of the Act are required to be just and reasonable. Reparation is a remedy for damages to the extent that the filed rates exceed a just and reasonable rate. Since primary jurisdiction to determine a just and reasonable rate rests with the Interstate Commerce Commission, any proceeding involving reparations, whether administrative or judicial, requires a finding of that Commission as to what a specific just and reasonable rate is. Under the remedial sections of Part I cited above, reparations may be recovered from rail carriers through either administrative or judicial proceedings. If the judicial avenue is chosen, a suit is filed in the district court, then there is a reference to the ICC for a determination of the just and reasonable rate, after which the suit is decided in accordance with this determination. No comparable provisions for reparations were originally included in the motor carrier part of the Act, but for some time it was assumed that the savings clause of § 316(j) allowed a comparable judicial proceeding with respect to motor carriers. See 2 U.S.Code, Cong. & Adm.News, pp. 2936-2941 (1965). The T.I.M.E. case held that such a remedy was not preserved by the savings clause. This decision was countered by legislative action in 1965 when Congress amended the Act to provide a reparation remedy by judicial proceedings in § 304a(2).
 
 
 90
 We turn now to an analysis of T.I.M.E., Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959), and its effect on the survival of a restitutional remedy. Interpretation of the T.I.M.E. decision is not without difficulty; it was a 5 to 4 decision and both the majority and minority relied on the same case in reaching their conclusions — Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). Further difficulties are encountered by the gloss put upon the T.I.M.E. decision in the case of Hewitt-Robins, Inc. v. Eastern Freight-ways, Inc., 371 U.S. 84, 83 S.Ct. 157, 9 L.Ed.2d 142 (1962), and Pensick & Gordon, Inc. v. California Motor Express, 371 U.S. 184, 83 S.Ct. 264, 9 L.Ed.2d 227 (1962). Mr. Justice Harlan, the author of the T.I.M.E. decision dissented with two other justices, in the latter two cases.
 
 
 91
 The Texas & Pacific R. Co. v. Abilene Cotton Oil Co. case involved a state court proceeding in which the state court determined that certain railroad rates, charged in accordance with tariffs filed with the ICC, were unreasonable and awarded reparations to shippers. The Supreme Court reversed, holding that the state court had no jurisdiction to determine the reasonableness of rates, since that was within the primary jurisdiction of the ICC. As pointed out by Mr. Justice Black in the T.I.M.E. dissent, following the Abilene decision, reparations proceedings were often brought in courts which referred the issue of reasonableness to the ICC and then decided the suit in accordance with the ICC finding. Nevertheless, the majority in T.I.M.E. read Abilene to hold that courts may not adjudicate issues which are within the primary jurisdiction of the ICC. (See Mr. Justice Harlan's dissent in Hewitt-Robins, 371 U.S. at 90, 83 S.Ct. 157. As to the availability of the reference procedure with respect to motor carriers, T.I.M.E. held that this could not be utilized because it would permit the ICC to accomplish indirectly what Congress had not given it the authority to accomplish directly. Although not specifically discussed by the majority, apparently the reference procedure in rail carrier cases is justified because the ICC has direct reparation authority. Also, the court pointed out that shippers had some protection in the motor carriers' rate-making process, because rates could be changed only on thirty days notice, shippers could protest the change and be heard in the subsequent administrative proceeding, and the ICC had authority to suspend the changes for up to seven months, by which time ordinarily a final determination would have been made.
 
 
 92
 Lower courts initially interpreted T.I.M.E. to mean that no common law remedies survived in motor carrier cases where primary jurisdiction rested with the ICC. Pensick & Gordon, Inc. v. California Motor Express, Ltd., 302 F.2d 391 (9th Cir. 1962); Hewitt-Robins, Inc. v. Eastern Freight-ways, Inc., 293 F.2d 205 (2nd Cir. 1961). But this notion was dispelled by subsequent Supreme Court decisions. In the review of the Hewitt-Robins case, 371 U.S. 84, 83 S.Ct. 157, 9 L.Ed.2d 142 (1962), involving a misrouting practice, the Court held that survival of a remedy against a carrier, even if the practice was within the primary jurisdiction of the ICC, depended solely on whether the remedy was consistent or inconsistent with the Act. T.I.M.E. was explained on the grounds that to allow reparations would interfere with the stability of the rate structure. No specific test of consistency was suggested, but the Court was influenced primarily by the following factors:
 
 
 93
 "Unlike rate making there is no statutory procedure by which routing practices may be challenged in advance of shipment. * * *
 
 
 94
 "* * * [T]he allowance here of a damage action nowise hampers the efficient administration of the Act, unlike the allowance of such an action as to unreasonable rates. * * * Moreover, the allowance of misrouting actions would have a healthy deterrent effect upon the utilization of misrouting practices in the motor carrier field, which in turn would minimize `cease and desist' proceedings before the Commission. Finally, and not to be overlooked, the absence of any judicial remedy places the shipper entirely at the mercy of the carrier, contrary to the overriding purpose of the Act. The allowance of such actions would, on the contrary, give neither an unfair advantage." 371 U.S. at 87-88, 83 S.Ct. at 159.
 
 
 95
 The result in Hewitt-Robins was to allow survival of a remedy for misrouting practices. The Pensick & Gordon case, supra, was vacated and remanded for reconsideration in light of Hewitt-Robins, 371 U.S. 184, 83 S.Ct. 157, 9 L.Ed.2d 142 (1962), and on reconsideration the Ninth Circuit allowed survival of a remedy against a motor carrier for refusal to render service. Pensick & Gordon, Inc. v. California Motor Express, 323 F.2d 769 (9th Cir. 1963), cert. denied, 375 U.S. 984, 84 S.Ct. 517, 11 L.Ed.2d 472 (1964). These cases do not dispose of the instant case, because we do have involved here a rate-making proceeding. But since the remedy at issue, restitution, is not the same as that involved in T.I.M.E., reparations, we must determine whether that remedy survives under § 316(j), in light of the criteria to be distilled from T.I.M.E. and Hewitt-Robins.
 
 
 96
 According to our reading of these two cases, the following criteria determine the survival of a remedy: (1) Does application of the remedy involve adjudication of an issue within the primary jurisdiction of the Interstate Commerce Commission? (2) Does the remedy enable the Commission to accomplish indirectly what it cannot accomplish directly? (3) Does the remedy interfere with the stability of the rate structure? (4) Does the remedy otherwise hamper the efficient administration of the Act? We conclude that under none of these criteria is restitution precluded.
 
 
 97
 The key problem with respect to the first criterion is "adjudication." In a suit for reparation because of an unreasonable rate or one for damages because of unreasonable routing practices or for refusal to render services, the basic issue is obviously one within the primary jurisdiction of the Commission. But in awarding restitution under the facts of this case — i.e. for the period of the temporary restraining order — it is difficult to see that the court is adjudicating anything involving the primary jurisdiction of the Commission. We are of course determining the effect of a Commission order, but that does not involve a factual determination which brings the primary jurisdiction doctrine into play. Insofar as we decide that a proper construction of the Commission's order requires restitution, we are deciding a question of law to which the Commission's expertise does not reach. See 3 Davis, Administrative Law Treatise § 19.02 at p. 8 (1958). Furthermore, the primary jurisdiction problem ordinarily arises only when a court is requested to act initially on a problem; but here we are proceeding on review of an order where the Commission has already acted. 3 Davis, Administrative Law Treatise § 19.01. Thus it does not appear that this remedy is barred because of the primary jurisdiction of the ICC.
 
 
 98
 As to the second criterion, allowance of restitution would not permit the Commission to accomplish indirectly what it cannot accomplish directly. As we view the situation, to allow restitution merely gives effect to the Commission's order of cancellation, and clearly this order was within its power.
 
 
 99
 Whether allowing restitution would interfere with the stability of the rate structure is a somewhat more difficult problem. It is not at all clear what "interference" the Supreme Court saw in the reparation remedy in the T.I.M.E. case, especially since it was exactly that remedy which was restored to the statute in the Congressional amendment to § 304a. In any event, since the carriers concede that the remedy under § 304a could be pursued in this case, there would seem to be no more interference in allowing restitution. The stability of the ratemaking process which the court referred to in T.I.M.E. involved the process of filing rates, publishing, giving notice, an opportunity for protest, holding hearings and issuing a final order. Here that whole process has been completed. Where either party then seeks review of that process, and particularly where a stay of the Commission order is granted, there is necessarily a certain amount of interference. The problem which the court faces then is to determine how that interference can be kept to a minimum. The solution to the problem is to accord sufficient remedies to both parties to insure protection upon the ultimate resolution of the agency action. Thus, in appropriate cases, the correlative remedy to the temporary restraining order is a bond and restitution.
 
 
 100
 The final criterion to be investigated is whether allowance of the remedy interferes with the efficient administration of the Act. Since the carriers admit that the § 304a remedy is available, the real question here is whether remitting the shippers to that remedy is preferable to allowing restitution. We see numerous reasons for preferring restitution under the circumstances of this case.
 
 
 101
 First of all, permitting restitution will avoid a multiplicity of suits in a case such as this where it is ancillary to a suit instituted by the carriers. Many, if not most, of the issues to be decided in the carriers' review proceeding would be determinative of the issues involved in a subsequent proceeding for either "reparations" or restitution — e.g., the validity of the Commission's order, the validity of the rates, the amount of the recovery. To remit the shippers to the § 304a remedy would require the filing of a new lawsuit, a reference to the Commission, and subsequent judicial proceedings on the Commission's findings.
 
 
 102
 Secondly, to require this procedure in a case such as this would require double litigation before the Commission of the same rates — once in the challenge to the tariff and again in the reparation proceeding. This seems to us to be an unwarranted burden on the Commission's resources. The apparent purpose of the reparation remedy was to allow shippers to recover damages from rates which had been filed with the Commission, but which were for some reason unlawful and which had not been subject to the ordinary processes of agency review. Where those rates have gone through the proper agency channels, and where the Commission has finally acted, it would seem more efficient to allow any proper judicial remedies upon subsequent judicial review of that action.
 
 
 103
 Thirdly, to require the reparation remedy would result in depriving the shippers of just those protections in the ratemaking process which the Supreme Court found so important in the T.I.M.E. case. Here the shippers have successfully challenged the carriers' rates in the administrative proceeding. In the course of that proceeding, they had to pay the higher rates which were ultimately ordered canceled for over 18 months. The carriers failed to comply with the Commission's order. To hold that the shippers have no remedy for this failure of compliance, except to litigate the whole issue all over again, would make a mockery of the statutory process for challenging carrier-made rates.
 
 
 104
 Finally, allowing restitution in this case would have the advantage of protecting not only the instant parties to the litigation, but also to some extent the general public. It is reasonably certain that many members of the general shipping public, who ultimately bore the burden of the higher rates in force by virtue of the temporary restraining order, will be unable for practical reasons to recover these charges. To the extent that allowing restitution in cases where the carrier fails to successfully prosecute his challenge to the administrative order will deter challenges of doubtful merit, the purposes of the Act in protecting the general public will be served.
 
 
 105
 We conclude that the principles of T.I.M.E. do not preclude restitution on this case, nor is § 304a an exclusive remedy.
 
 
 106
 C. The policy of the Act disallowing refunds.
 
 
 107
 We turn now to the carriers' contention that allowing restitution would contravene the policy of the Act prohibiting carriers from making refunds from published tariffs and that the only published tariffs are the ones from which the shippers seek restitution. This argument derives from 49 U.S.C. § 317(b) which provides: "No common carrier by motor vehicle * * * shall refund or remit in any manner or by any device, directly or indirectly, or through any agent or broker or otherwise, any portion of the rates, fares or charges so specified * * * in its tariffs. * * *" Violation of this provision subjects the carrier to criminal sanctions under § 322(a). In order to make this section applicable, the carriers must adopt the position, as indeed they do, that under no circumstances can a refund from published tariffs be awarded, even where the Commission has specifically ordered cancellation of existing rates and the carrier has failed to comply with this order. Alternatively, it is implied in several instances in the carriers' brief that the lower court's action validated collection of the published tariffs. Either position is manifestly untenable.
 
 
 108
 In their brief, the carriers argue the first position as follows:
 
 
 109
 "* * * [T]he only lawful rates which may be collected by the carriers are those in duly published tariff schedules. * * * The schedules can be changed only upon publication of new schedules by the carriers. This is true even when the Commission orders a rate canceled. * * * Carrier compliance, not the Commission order, makes the new rate effective" (Carriers' Br., p. 24.)
 
 
 110
 * * * * * *
 
 
 111
 "It is clear, as all here must agree, that the carrier initiates the rate, that the Commission may order the rate cancelled, but that such cancellation becomes effective, not by Commission order, but by carrier compliance with the Commission order. Failure of compliance is punishable, but does not render the rate unlawful." (Carriers' Br., p. 45.)
 
 
 112
 Before discussing the law on this issue, we take note of certain practical implications of the carriers' position. The proposition that a carrier may wilfully ignore an order of the Commission and collect charges under a tariff that the Commission has ordered canceled without any liability to shippers is on its face highly questionable. As Justice Cardozo noted in the Atlantic Coast Line case, supra:
 
 
 113
 "The carrier was not at liberty to take the law into its own hands and refuse submission to the order without the sanction of a court. It would have exposed itself to suits and penalties, both criminal and civil, if it had followed such a path. * * * Obedience was owing while the order was in force." 295 U.S. at 311, 55 S.Ct. at 717. (emphasis added.)
 
 
 114
 Furthermore, this proposition is totally inconsistent with the carriers' actions and contentions in all the proceedings prior to this appeal. Lest there be any misunderstanding, we emphasize here that we are not implying any "estoppel" of the carriers to assert this proposition in this court, simply because of their prior position. But where a contention is prima facie doubtful, and where all parties to a proceeding, including the one now standing on the contention, have acted exactly opposite to the position now taken, that is strong evidence of what the legal situation is in fact. The record before us shows quite clearly that the carriers, the shippers, the Commission, the district judge who granted the temporary restraining order, and the Three-Judge Court which denied the temporary injunction all operated on the assumption that unless there was a stay of the Commission's order, the carriers would be unable to charge the rates in the tariff which was ordered canceled. The evidence in the record to this effect is voluminous, of which the following samples are indicative.
 
 
 115
 First of all, we note the repeated attempts, some of which were successful, of the carriers to obtain postponement of the Commission's order. If the carriers were free to ignore the Commission's order, there would seem to be no urgency in getting these postponements. Secondly, the motion for the temporary restraining order, filed concurrently with the complaint to set aside the Commission order, specifically alleged that if the order became effective they would suffer substantial loss of revenue and be required to offer transportation services for noncompensatory rates. Obviously, this could not occur if they could continue to charge the existing tariffs. The district judge, in granting the temporary restraining order, expressly found that "unless enforcement [of the order] * * is restrained by this Court, and the effective date thereof suspended, immediate and irreparable injury, loss and damage will result to [carriers]. * * *" Again, their could be no such injury if the carriers could ignore the order without having to make refunds.
 
 
 116
 In the judicial proceedings below, the carriers consistently maintained the position that unless they were awarded temporary relief, the Commission order was self-executing and they would suffer a loss of revenue. The following excerpts from the hearing to extend the temporary restraining order are indicative of the argument of carriers' counsel:
 
 
 117
 "We are talking about a tariff that * * * but for the temporary relief and very urgent relief obtained from this Court, would have been cancelled as of Monday of this week.
 
 
 118
 * * * * * *
 
 
 119
 "Once this order becomes effective, this matter, this application [for review of the Commission order] is at an end. The order is self-executing. * * *
 
 
 120
 * * * * * *
 
 
 121
 "[I]t is a perfectly lawful charge that has been made, and it continues lawful until for one reason or another the effective date of the Commission's order comes about." (emphasis added.)
 
 
 122
 In granting the extension of the temporary restraining order, with the protection of a $300,000 bond, the district judge again did so on the specific finding that unless the order were restrained the carriers would suffer an immediate loss of revenue.
 
 
 123
 In the hearing before the Three-Judge District Court on the granting of the interlocutory injunction, the carriers again took the position that unless the relief were granted, the order was self-executing and they would not be able to charge the rates prescribed in the tariff. After spending some time arguing the merits of the Commission's order, carriers' counsel was urged by the Court to get to the immediate issue of the necessity for the preliminary injunction. He did so as follows:
 
 
 124
 "Mr. Evarts: The last sentence of the order says that on one day's notice the carrier shall publish new rates, and these proceedings shall be discontinued. There is nothing left. We have nothing to review because the Commission order has in effect executed itself. * * * [A]nd so the only way that we can get a review is to stay the effect of the Commission's order so that this Court can determine whether or not we were in fact denied a fair hearing by the Commission and if the Commission acted improperly. We have no other remedy. We have exhausted administrative remedy and without this order staying in effect we are denied judicial review which Congress says we have a right to. * * *
 
 
 125
 "Judge Blackmun: I take it, Mr. Evarts, your mootness argument is that if the temporary injunction is denied, then the Commission's order is self-executing * * *.
 
 
 126
 "Mr. Evarts: That is one result that would follow."
 
 
 127
 In denying the interlocutory injunction, the Three-Judge Court did so in part on the grounds that staying the Commission's order would cause considerable loss and injury to the general public. There could have been no such finding were it not the consensus of all the participants that the effect of the Commission's order was to prevent the carriers from charging the higher rates.
 
 
 128
 Were we to uphold the carriers' contention that no restitution is possible from these tariffs because they had not published any others, that holding would itself be a conclusive argument against the granting of any temporary restraining order against a Commission order like the one in this case. For if the carriers are free to charge the rates in a tariff ordered canceled, without any liability to shippers resulting, then there can be no showing of irreparable injury which is a necessary prerequisite to the granting of a temporary restraining order under 28 U.S.C. § 2284. According to the provisions of this section a temporary restraining order may not be issued against the Commission, unless the district court makes "a specific finding, based upon evidence submitted to such judge and identified by reference thereto, that specified irreparable damage will result if the order is not granted." To the carriers' suggestion that the temporary restraining order is necessary in order to obtain an "orderly review" (apparently in the absence of irreparable damage), this section provides a complete answer. It is not necessary. Equally explicit is 28 U.S.C. § 2324, which provides that the pendency of an action to review a Commission order shall not of itself operate as a stay of that order. It is abundantly clear that "orderly review" can be obtained without a stay of the Commission's order. A stay is justified only if there is irreparable damage, and there is no such damage in the instant case if the carrier may charge rates which have been ordered canceled without liability.
 
 
 129
 The case law on this issue reveals the fallacy of the carriers' argument. A rate which is filed with the Commission is not ipso facto a lawful rate. It is the applicable rate which the carrier must, under the compulsion of § 317(b), charge to shippers in the regular course of business. The reason for the requirement is plain. Requiring payment of rates according to published tariffs without question reduces the possibility that carriers will prefer some shippers over others, keeps interstate traffic flowing speedily without interruptions for on-the-spot disputes over rates, and encourages the channelling of those rate disputes that do arise to the Commission and the courts for adjudication. But merely because the carrier is bound to charge the filed rate, it does not follow that he is necessarily entitled to keep it.
 
 
 130
 This distinction was made abundantly clear by the Supreme Court in the case of Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932):
 
 
 131
 "In order to render rates definite and certain, and to prevent discrimination and other abuses, the statute required the filing and publishing of tariffs specifying the rates adopted by the carrier, and made these the legal rates; that is, those which must be charged to all shippers alike. Any deviation from the published rate was declared a criminal offense, and also a civil wrong giving rise to an action for damages by the injured shipper. Although the Act thus created a legal rate, it did not abrogate, but expressly affirmed, the common-law duty to charge no more than a reasonable rate, and left upon the carrier the burden of conforming its charges to that standard. In other words, the legal rate was not made by the statute a lawful rate — it was lawful only if it was reasonable. Under section 6, the shipper was bound to pay the legal rate; but, if he could show that it was unreasonable, he might recover reparation." 284 U.S. at 384, 52 S.Ct. at 184. (footnotes omitted.)
 
 
 132
 Even where the Interstate Commerce Commission has conducted a full review of a filed rate, and refused to find it unlawful, it is not thereby converted into a lawful rate:
 
 
 133
 "The finding of the Commission that the proposed schedules `are not shown to be * * * unlawful'. * * * has been held by the Commission not to constitute an approval or a prescription of the rates. * * * [T]hey stand only as carrier-made rates which, under the Commission's decisions, leaves them open to possible recovery of reparations." Interstate Commerce Commission v. Inland Waterways Corp., 319 U.S. 671, 686-687, 63 S.Ct. 1296, 1305, 87 L.Ed. 1655 (1943) (footnote omitted).
 
 
 134
 Reparations proceedings inevitably involve a refund from published tariffs, regardless of any provisions in the Act preventing the carrier from making such refunds personally. Cf. National Motor Freight Traffic Assoc. v. United States, 268 F.Supp. 90 (D.C.1967), aff'd, 393 U. S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968).
 
 
 135
 Just as published tariffs are not a bar to a refund by means of reparations proceedings if they are not lawful, so the published tariffs are not a bar to an appropriate judicial remedy if for some reason they are not lawful. Several cases illustrate this principle. Thus in Inland Steel Co. v. United States, 306 U. S. 153, 59 S.Ct. 415, 83 L.Ed. 557 (1939), shippers claimed advantage of a tariff which had been ordered set aside by the ICC, but which had remained in effect by virtue of a court order. The shippers contended that the statutory requirement that published tariffs be observed entitled them to the lower rates, even though those rates were in contravention of a Commission order. The Supreme Court answered this contention:
 
 
 136
 "[T]he published tariff had contained the unlawful allowance solely because of the court's injunction. To sustain the contention of appellant that the provision for allowances in the published tariff limited the authority of the court to prevent their payment would be to clothe a published tariff, in existence solely by reason of equitable intervention, with an immunity from equity itself. The Interstate Commerce Act grants no such immunity. Cf. Merchants Warehouse Co. v. United States, 283 U.S. 501, 511, 51 S.Ct. 505, 75 L.Ed. 1227." 306 U.S. at 159, 59 S.Ct. at 419.
 
 
 137
 Similarly, in Chicago, M., St. P. & P. R. Co. v. Alouette Peat Products, Ltd., 253 F.2d 449 (9th Cir. 1957), the court ordered the Commission to award to shippers the difference between a tariff which had not been published on the statutory 30-day notice, and the immediately prior published tariff, even though the Commission had refused to award reparations on the finding that the rates were not unjust or unreasonable. There the Commission had authorized the carriers to publish specified increased rates on five days notice. The carriers published rates higher than those authorized. When the shippers protested, the Commission found that the higher rates were justified and refused to order reparations. The Ninth Circuit expressly recognized that the new tariffs were the applicable ones which the carrier was bound to collect. But it also held that the carrier was not entitled to keep them where it had not complied with the ICC order. So here the carriers were entitled to collect the higher rates, but were not entitled to keep them when they have not complied with the ICC order.
 
 
 138
 Finally, the Accelerated Transport case, 227 F.Supp. 815, discussed above, recognizes the same principle. There the carriers charged rates in tariffs ordered canceled by the Commission while those tariffs were in effect during the period of the temporary restraining order. Following affirmance of the Commission's order and dissolution of the temporary restraining order, the Court ordered a refund (implemented as described in the discussion above) from the published tariffs.
 
 
 139
 For the proposition that the carriers may collect and retain charges from published tariffs which are in violation of a Commission order without liability, the carriers cite several cases, none of which support the contention and most of which support the exact opposite. One such case is Alouette Peat, discussed above. Another is Chase & Co., Inc. v. Atlantic Coast Line R. Co., 220 I.C.C. 398 (1937), and cases cited therein. Apparently the carriers are referring to the following language in the Commission's opinion:
 
 
 140
 "Rates filed with the Commission and published in the manner provided by law are the applicable rates even though they differ from the rates prescribed in an outstanding order of the Commission. Ralston Purina Co., Inc. v. Atlanta, B. & C. R. Co., 174 I.C.C. 722, by division 5; Dewey Portland Cement Co. v. Atchison, T. & S. F. Ry. Co., 185 I.C.C. 233, by division 2; Dewey Portland Cement Co. v. Atchison, T. & S. F. Ry. Co., 188 I.C.C. 97, by division 5; Texas Produce Co. v. Illinois Central R. Co., 209 I.C.C. 113, by division 3." 220 I.C.C. at 400.
 
 
 141
 But in that case the Commission was only recognizing the rule emphasized here, that the published rate is the applicable rate which may be collected during shipment. It did not hold and did not purport to hold that the published applicable rate was the lawful rate which the carrier was entitled to keep. In every single case cited by the Commission, where a timely action was brought by the shippers, and where the carriers published tariffs which were found to have violated a Commission order, the Commission ordered reparations. In the Chase case itself, the Commission found that the carriers had complied with its order and refused reparations.
 
 
 142
 The carriers also cite Chicago, I. & L. Ry. Co. v. International Milling Co., 43 F. 2d 93 (8th Cir.), cert. denied, 282 U.S. 885, 51 S.Ct. 89, 75 L.Ed. 781 (1930), decided by our Circuit. The case is of doubtful relevance to this situation, but to the extent that it is relevant it also is contrary to the carriers' position. There the carriers apparently had on file two tariffs applicable to the same shipment. The later filed tariff set lower rates than the earlier one. The carriers accepted a shipment at the lower rates and then sued to collect the higher rates in the earlier tariff, contending that it was the applicable tariff because they had not complied with a Commission rule requiring that a new tariff specifically state which prior tariffs were canceled. We held that the lower rate was applicable. There the carriers contended that they were entitled to collect a higher rate because they had not complied with a Commission rule. Here the carriers contend that they are entitled to keep a higher rate because they have not complied with a Commission order. In neither case is the contention sound.
 
 
 143
 Only a few words need be said concerning the suggestion that the carriers are entitled to keep the charges because the tariffs remained in effect because of the temporary restraining order. The language quoted from the Supreme Court's Inland Steel decision, supra, disposes of this contention, as do most of the cases discussed above relating to the general principles of restitution. See also Socony Mobile Oil Co. v. Brooklyn Union Gas Co., 299 F.2d 692 (5th Cir.), cert. denied, 371 U.S. 887, 83 S.Ct. 182, 9 L.Ed.2d 121, affirming Brooklyn Union Gas Co. v. Transcontinental Gas Pipe Line Corp., 201 F.Supp. 679 (S.D.Tex.1960).
 
 VI. STANDARDS FOR RESTRAINT OF AGENCY ORDERS
 
 144
 Certain concluding observations are necessary in order to put the above discussion of the carriers' affirmative contentions in the proper perspective. Up to this point we have discussed these contentions in the context of the remedy of restitution as it relates to other aspects of carrier-rate regulations — e.g., the T.I.M.E. decision, reparations, overcharges, remedies for unlawful practices under the Hewitt-Robins doctrine, etc. This focus arises because of the carriers' insistence that the restitutional remedy is forbidden by the Interstate Commerce Act. As a matter of legal analysis, this focus is too narrow. In the context of this case, the question of restitution arises because the carriers invoked the aid of the federal courts performing their equitable functions. Traditionally, the restitution remedy has been available to persons who are injured by the restraint of an administrative agency order where that restraint was not warranted.[4] If we were to hold that the remedy is not available in proceedings to review Interstate Commerce Commission orders, that would be equivalent to holding that Congress intended the federal courts, in staying orders of the Commission, had significantly limited powers to protect the interests of affected parties and had authorized a misuse of the court's equitable process.
 
 
 145
 In setting out procedures to be followed on review of Commission orders, Congress has carefully insured that the public interest be protected. Recognizing the importance of review of administrative action to the regulatory process, it has required that review to be by a three-judge district court rather than a single judge. In order to assure prompt settlement of the issues, direct appeal to the Supreme Court is authorized, thus bypassing the ordinary intermediate review in Courts of Appeals and discretionary review by way of certiorari. No injunctions can be issued, except by a panel of three judges, and hearings on injunctions are to be expedited. Most importantly for purposes of the instant case, temporary restraining orders are not to be granted except upon written findings of irreparable injury. Courts have been careful not to interfere unduly with the administrative process and have developed standards by which to determine whether a stay of an administrative order is to be granted. The effect of the stay upon all parties to the proceeding, as well as the public interest, is carefully considered. Under these standards, it is clear that injury alone to the party seeking review, even irreparable injury, is not in and of itself sufficient to justify the stay. The court below was quite cognizant that the stay in this case would injure other persons and went to some lengths to protect them. If we were to hold that protection could not be afforded by allowing restitution where it is clearly warranted, that would be a strong argument for not granting a stay.
 
 
 146
 The case most clearly setting out these standards for a temporary stay of a Commission order is Virginia Petroleum Jobbers Assoc. v. Federal Power Commission, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958):
 
 
 147
 "(1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal? * * * (2) Has the petitioner shown that without such relief, it will be irreparably injured? The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. * * * (3) Would the issuance of a stay substantially harm other parties interested in the proceedings? On this side of the coin, we must determine whether, despite showings of probable success and irreparable injury on the part of petitioner, the issuance of a stay would have a serious adverse effect on other interested persons. Relief saving one claimant from irreparable injury, at the expense of similar harm caused another, might not qualify as the equitable judgment that a stay represents. (4) Where lies the public interest? In litigation involving the administration of regulatory statutes designed to promote the public interest, this factor necessarily becomes crucial." 259 F. 2d at 925.
 
 
 148
 Baggett Transportation Co. v. Hughes Transportation, Inc., 393 F.2d 710 (8th Cir.), cert. denied, 393 U.S. 936, 89 S.Ct. 297, 21 L.Ed.2d 272 (1968); Braswell Motor Freight, Inc. v. United States, 297 F.Supp. 215 (S.D.Miss.1969).
 
 
 149
 From these considerations, it is evident that the federal courts must be exceedingly careful in granting the extraordinary relief of a stay of an agency order. It follows that once that power has been exercised, they must be equally careful in assuring that all parties affected are protected insofar as possible. Where restitution provides that protection and is warranted, it should be granted. Nothing in the Interstate Commerce Act should be construed to require a contrary result.
 
 
 150
 VII. THE EQUITIES OF RESTITUTION IN THE INSTANT CASE
 
 
 151
 We have concluded that the cancellation order of the Interstate Commerce Commission made it unlawful for the carriers to collect charges under that tariff following the effective date of the order, that the effect of the order was to compel a reduction of rates to the preexisting level, and that the carriers can be compelled to make restitution for higher rates charged in violation of the order which are collected by virtue of a court's restraint of an order not proved to be invalid. This does not dispose of all the problems in the instant case, for the carriers contend that there was no wrongful restraint in this case, and that the decision of the trial court that there are no equitable grounds for relief is adequately supported by the record.
 
 
 152
 The contention that the restraint in this case was not wrongful is based on the fact that there was no final decision on the merits of the validity of the Commission's cancellation order. Since there was no such final decision, the carriers argue that the possibility remains that the Commission's order was invalid, that they were entitled to maintain the challenged tariffs, and consequently that the shippers would not have been entitled to restitution. Thus they conclude that without such a final determination on the merits, there can be no legal basis for awarding restitution. The fundamental error in this analysis is the tacit assumption that because they chose to challenge the Commission's order in court, that order somehow became less final or its validity became open to question. This assumption is erroneous.
 
 
 153
 "[T]he Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid. * * *" Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944).
 
 
 154
 See also Interstate Commerce Commission v. City of Jersey City, 322 U.S. 503, 512-513, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944). The Commission's order was at all times binding upon the carriers until they successfully concluded a suit proving its invalidity; and restitution may be ordered for higher rates collected in violation of the order by virtue of the court's injunctive process in the absence of a final decision setting aside the order. This conclusion is supported by the following reasons.
 
 
 155
 First of all, prior case law is consistent with this conclusion. In the Arkadelphia case, discussed above, 249 U.S. 134, 39 S.Ct. 237, 63 L.Ed. 517, the carriers made a similar argument. There the carriers' suit against the state rates was dismissed without prejudice because they failed to sustain their burden of proof to show the invalidity of the rates. When restitution was then ordered, the carriers argued that the dismissal without prejudice left the rights of the parties in doubt. But the Supreme Court held that restitution was proper so long as the state rate order remained in effect.
 
 
 156
 Another analogous situation was present in Ex parte Lincoln Gas, 256 U.S. 512, 41 S.Ct. 558, 65 L.Ed. 1066, also discussed above. There a district court upheld the validity of a municipal gas rate ordinance in 1915, but stayed its operation pending appeal. In 1919, the Supreme Court affirmed the decision, with the modification that it be without prejudice for the period following 1915, taking judicial notice that increased labor costs and returns on capital following World War I might render it noncompensatory. On remand, restitution was ordered for the 1915-1919 period during which the injunction was in effect pending appeal. This was held proper on the grounds that the ordinance was presumptively valid until the companies successfully concluded a suit against it.
 
 
 157
 This conclusion is also consistent with the generally adopted position that the voluntary dismissal of an injunction suit by a plaintiff without the consent of the defendant is a determination of the merits of a controversy so as to render the plaintiff and his sureties liable on the injunction bond. See "Annotation: Dismissal of Injunction Action or Bill without Prejudice as Breach of Injunction Bond," 91 A.L.R.2d 1312 (1963). Here the carriers by their own actions rendered the issues in the main suit moot and procured the dismissal. They received the benefit of the temporary restraining order without ever proving the Commission order invalid; such proof is a prerequisite to the absolution of liability for those benefits.
 
 
 158
 It is also significant in this case that while there has not been a determination on the merits of the ICC order, there has been a determination that the carriers were not entitled to injunctive relief from the order. The denial of the interlocutory injunction on the grounds of the "remote possibility" of the carriers' success on the merits is clearly a decision that the carriers should be required to comply with the Commission order until they successfully completed a suit against it. The standards discussed above with respect to stays of administrative agency orders apply equally to temporary restraining orders and interlocutory or temporary injunctions. Where a party fails to prove grounds sufficient for the grant of an interlocutory injunction, he at the same time shows that the temporary restraining order should not have been granted, at least to the extent of rendering him liable in restitution for benefits received under the temporary restraining order. The carriers in Arkadelphia argued that the denial of the permanent injunction did not determine that the temporary injunction was wrongfully issued. The Supreme Court held that the failure to carry their burden of proof on the permanent injunction was itself sufficient to show that the temporary injunction should not have been allowed. So here, the failure to carry the burden of proof on the interlocutory injunction shows that the temporary restraining order should not have been issued, in the absence of a later decision in the carriers' favor on the merits.
 
 
 159
 It is now necessary to consider the equitable grounds of the Three-Judge District Court's decision denying restitution. It should be pointed out that nothing in that opinion suggested that the court felt it was without power to award restitution should the circumstances warrant. Rather, its decision rested on its assessment of the equities of the situation. In this respect, we think the decision was clearly erroneous in four aspects.
 
 
 160
 First of all, it is quite clear that the Three-Judge Court proceeded on the assumption that if restitution were to be awarded in this case, a decision on the merits of the ICC order would be necessary. The Court's well-founded distaste for deciding moot issues more than likely affected its determination of the merits of the counterclaim. But in fact, as we have shown above, the shippers' right to restitution did not require a determination on the merits of the order. Once the Three-Judge Court decided that issue was moot, its statutory function was at an end and the case should have been referred to a single judge for determination of the counterclaims. Public Service Commission of Missouri v. Brashear, 312 U.S. 621, 61 S.Ct. 784, 85 L.Ed. 1083 (1941).
 
 
 161
 Secondly, the Court found that the Commission had never determined the rates to be unlawful. This finding probably was a product of the carriers' insistence that the failure to sustain the burden of proof under § 316(g) does not render the tariff unlawful. But we have held above in the third part of this decision that such a failure, combined with a cancellation order does render the tariff unlawful. This is of course to be distinguished from a finding of unlawfulness because of some substantive violation of the Act, but nevertheless, the tariff was unlawful as of the cancellation date of the Commission order and remained so until the carriers proved the order invalid.
 
 
 162
 Thirdly, the court suggested that to order restitution would imply an affirmative determination of the Court that the rates were unjust and unreasonable. Such a determination is within the primary jurisdiction of the Commission. But awarding restitution would not imply such a finding. It would merely recognize the effect of the Commission order, which we have shown to require a reduction in the carriers' rates in the context of this case. Restitution is the proper remedy to return the parties to the position they would have been in had the Commission's order not been judicially restrained.
 
 
 163
 Finally, the Court was understandably influenced by the Commission's order of September 30 postponing compliance until October 11. However, this order does not and cannot affect the shippers' right to restitution for the period of the court's temporary restraining order. We may note here that the Commission's explanation of its order is not entirely satisfactory. When the carriers applied for their temporary restraining order on September 9, they had only four more days until the compliance date of September 13. The Commission at that point had not considered it justified to extend the compliance date any further. When the interlocutory injunction was denied on September 24, the temporary restraining order was extended for five more days until September 29. Thus the carriers had at least one more day to comply with the order than the Commission had granted, and actually had had a total of two weeks extra. For the Commission to contend that its September 30 postponement was entered solely because of the court's restraint simply does not make sense. Nothing in the Court's order compelled such a result. However, we need not be concerned here with the reasons for the Commission's action, for it is quite clear that the order was not retroactive, and hence cannot affect the restitutional rights of the parties during the period when the court had jurisdiction of the case. A similar situation arose in Inland Steel Co. v. United States, 306 U.S. 153, 59 S.Ct. 415, 83 L.Ed. 557 (1939), where the Commission stayed an order that was being reviewed in the courts. Once the order was affirmed, the parties contended that the Commission's stay prevented restitution. But the Supreme Court held that "since the court had exercised jurisdiction to review and suspend the Commission's report and order, the administrative body was without power to act inconsistently with the court's jurisdiction. * * *" Id. at 160, 59 S.Ct. at 419. And restitution was proper in spite of the stay order.
 
 
 164
 The decision is reversed and remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The proposed rates have application between, to, or from points in Colorado, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, New York, North Dakota, Ohio, Pennsylvania, South Dakota, West Virginia, Wisconsin, and Wyoming
 
 
 [2]
 Under regular procedure 30 days notice would be required. 49 U.S.C. § 317(c)
 
 
 [3]
 These increased rates were converted by the carriers from per-shipment charges to hundred-weight rates to take effect May 1, 1966. These rates were ordered suspended and investigated. Substitute tariffs were published to take effect September 1, 1966. These also were ordered suspended and investigated. The suspended matter was canceled and the proceedings were discontinued April 11, 1967, without issuing any findings or order
 
 
 [4]
 We recognize that the issuance, often ex parte, of a temporary restraining order is a necessary and not uncommon practice to preserve the status quo and prevent claimed irreparable injury. In referring to an improvidently issued temporary restraining order, we are not implying that the judge in any way acted improperly. Rather, the restraint is wrongful or improvident in the sense that the party who obtained its benefit is later found not to have been entitled to it or has failed to prevail on the merits